The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning, ladies and gentlemen. We have two cases to be argued this morning. The first is BlackBerry Limited v. Facebook, Inc., 2020-12-56 and 12-58. Mr. Weisburst. May it please the court, Sanford Weisburst for Appellant BlackBerry. The district court, while it was correct in denying a motion to dismiss on patent eligibility, erred at the summary judgment stage in finding that the patents were ineligible. BlackBerry's claims are eligible and at least should have been preceded past summary judgment because they, in the words of this court in Packet Intelligence, meet a challenge unique to computer networks. More specifically, the 351 and 929 patents address overuse of the bandwidth on the network and the mobile device's battery. The 327 and 084 patents address the problem of tedious toggling between applications on the device to find events. Under cases including Ancora, Bascom, Core Wireless, and DDR, the claims should have been found eligible and allowed to survive summary judgment. I'd like to begin by excluding... The first two patents ascended on a proxy content server. The district court said that that is simply not eligible. Yes, let me address that question, Your Honor. The district court made two errors in that respect. Number one, the court focused on the proxy content server as its own component as opposed to the way it interacts with the network. The proxy content server's importance is that it is an intermediary between, on the one hand, the information sources that come from the internet, and on the other hand, the mobile devices. And it acts as an... It's a conventional server, isn't it? The hardware itself could perhaps be labeled conventional. However, the way it's configured in the network with the software... And I'd refer the court to the Bascom decision where, similarly, software was allowed to provide the architecture and the novel concept to be added to conventional hardware. Therefore, calling a single component conventional hardware does not end the inquiry under this court's cases. And the reason why the proxy content server is different, even if it viewed as a component by itself, the reason why it's different from a conventional proxy server, which is what the prior art called it, is that it acts more as an autonomous entity. It is doing the work that the mobile device formally did under the conventional pull approach. And I'd refer the court to, among other pages of the appendix, 11995 and 18395, which explain that in the prior art, there was no proxy content server that was performing an active role in gathering and receiving information from the internet. Counsel, this is Judge Reyna. So what is the focus of the proxy server? And what did the court look at when they considered the proxy server? Did it consider the proxy server, its functionality? Or did it consider, what I understand your argument to be, that the proxy server causes an improvement in internet technology? Well, I think it's actually useful, and this may be slightly confusing, but I think it's useful to contrast the motion to dismiss decision at appendix 180 with the summary judgment decision. Because at the motion to dismiss stage, the judge, Judge Wu, correctly, in our view, looked at the overall invention. He talked about the, and this is again at page 180, he talked about how the proxy content server takes the information from the information sources, aggregates and stores it, and then sends it to the mobile device. He was speaking of it as a network, and he referred to the possibility, at least of a factual issue, on improvement of the technology. However, when we get to the summary judgment stage, the district court sort of takes a different outlook on this point. And he focuses narrowly on the proxy content server and doesn't focus as much on the other components. And he says, well, this proxy content server is something that existed in the prior art. So we think that that's sort of... Is it a clever way of using just normal standard components? Does that make it eligible? Or what is, in your view, the improvement on the technology? Sure. So, Judge O'Malley, the prior art technology, the problem that was seen, and this is at 18185 of the appendix, among other places, is that there was too much use of the bandwidth of the network, because you had to have the mobile devices constantly sending signals out to the information sources. So you're sending all these... That's all discussed in the provisional, right? It is discussed in the provisional, yes. And what does that take from the fact that that disappears from the later application? So we don't think... It's our view that it doesn't disappear. Rather, it's referred to more in shorthand. And this court has not required that the benefits or the comparison to the prior art be present in the claims, certainly. That's, among other things, the Uniloc LG case. But the court hasn't also required it in the specification. And I don't understand my adversaries to be arguing that in their briefs either. This court, in fact, in the recent Tech Sec case, acknowledged that you could have extrinsic evidence considered at step one on the issue of whether there was an improvement or comparison to the prior art. But where do you say it's referred to in shorthand? Can you point me to that at least? Yes, I can. And it's in the addendum to our briefs because the 351 patent is there. And I believe it is in column... Yes. If we look at Appendix 279, Column 2, towards the bottom, the proxy content server also provides a method of combining the information so that the mobile user has a consistent and transparent experience of receiving the information content and advertising content. That's what I would point the court to as sort of a cross-reference to the discussion that's certainly in more depth in the Provisional 18185. That was also supplemented, by the way, by expert evidence on this point, including the paragraphs of the Almorof Declaration and to the important point is a conventional piece of hardware by itself does not render something ineligible. And I think, Judge O'Malley, you referred to it as is it enough to have a clever idea of how to use those components? And I would respectfully submit the answer is yes. And in cases like BASCOM, in cases like ANCORA, ANCORA, I think, is maybe the closest decision to our case. Because in ANCORA, what you did was you took a conventional piece of hardware, which was the BIOS memory of the computer, the basic input-output set system memory. It existed for a while before the invention, but what the novel idea was to put the verification program for verifying that the user had a software license, to put it in that memory, the BIOS memory, instead of in conventional memory. So they took that was a clever idea. Counsel, what about the metatags? Aren't they just information? So the metatags are addressed, first of all, by the 929 patent, which is a companion patent shares pretty much the same specification. What that does, I think the best way to think about it is it's an additional sort of tool that this proxy content server in its broader environment uses to save on transmission from the proxy content server to the mobile devices. And it's not just a sort of shorthand code. That's how it was in the prior art, certainly. But in the context of this invention, what the metatag allows the invention to do is to wait until a user arrives at a space where the advertisement would be, and then only at that point to send the advertisement over this limited bandwidth network. And so it's not just... Counsel, can I ask a question about that, though? Is the claimed advance of the 929 really focused on the metatag? The 929 compared to the 351, if we look at claim one of each patent, perhaps the key difference is the metatag concept. That does not appear in 351. It's added for the first time in 929, which was a continuation of 351. In terms of... But isn't it still focused on the server? It's absolutely. Yes, I would not dispute that assertion. It is on the server. I would suggest that the metatag is an additional way in which the server can be efficient, can economize on the use of bandwidth. And I think it's helpful to step back. And this is a problem that's sort of uniquely solvable in the internet context. Because in a traditional newspaper context, and we saw, I think, Facebook in its brief referred to the idea of providing a sort of insert advertisement in a hard copy newspaper. The problem with that is that you have to provide that all up front at the same time when the newspaper is delivered. What the internet allows you to do for the first time is to send something at the moment, just in time that you need it. And so you can economize. Whereas in the prior art, you couldn't economize on not printing the insert. In the context of the 929 invention, you can wait until the user actually needs to read the advertisement and only then send it. And so therefore, you're economizing on the bandwidth. So it's certainly not the argument before the court today, but it's an additional, I guess, tool that the proxy content server uses to be efficient and to save on bandwidth. Now, I'd like to... I'm sorry. Does the 929 then, is that something that improves upon the server of the 351? The 929 with its meta tag is one aspect of the improvement that there's... I view these patents sort of as a set. The 929 is a continuation of the 351. I think they're working together. The 351 is certainly the more important improvement. I would say the 929 is an incremental improvement. If I could briefly... Counselor, this is to Joanna. To what extent do you have to rely on the provisional in order to save the claims of the 351 patent? I don't think it's absolutely necessary. I think it's certainly the most extensive explanation of the benefits compared to the prior. We also have expert testimony and inventor testimony on that score, which the TECSEC, among other cases, I think another example is Ariosa, do refer to extrinsic evidence. So that's even more further afield from the provisional. But the provisional is part of the file history. It's something that would be considered in here and this court's precedents don't rule it out. I see I'm into my rebuttal time, but I briefly want to address the second set of patents. And my key point there is that the district court focused on the information gathering aspect of those patents as opposed to the full set of what the patents do, which is to both gather the information and to display it on a single user interface on the mobile device. And that combination of features is similar to core wireless, among other cases. And that is the inventive and non-abstract notion there. If I could reserve the remainder of my time for rebuttal, I would do so. We will do that. Thank you, Your Honor. Ms. Keefe. Thank you, Your Honor. May it please the court. Heidi Keefe, arguing for appellees regarding the ads-related patents. What we just heard was an opulence of what the appellant wish the claim or the specification covers. But we have to look to exactly what the claim actually does cover. The claim requires nothing more than receiving information, storing it, selecting it to be sent somewhere else, and then potentially transmitting it. The information that can be stored and sent can be as small as a single bit. And this is something that was specifically acknowledged by the district court in its opinion. This is in our red brief at page 37. You can receive information according to the claim from a single source and information source. You can store that information, then send that information based on a trigger. The claim is silent to bandwidth or battery savings. It's silent to offloading from a mobile device. There's nothing to say that it couldn't still also- Well, that doesn't have to be in the claim, does it? So, Your Honor, I think it doesn't have to be per se in the claim. But what we learned, for example, from the Berkheimer decision is that if it's not distinctly referred to within the claim, that itself can trigger ineligibility. For example, in Berkheimer, I'm sure Your Honors are aware, the broader claims were found to be ineligible. And only when the claim added in where you don't restore repetitive information could you then achieve the benefit. The problem here is that- But we have said that you can find the description of benefits either in the written description or even through extrinsic evidence, haven't we? Yes, You have, Your Honor. But here, for example, there's no reason that the supposed benefit would be triggered if you followed the steps of the claim. For example, if you were to send simply a single bit, a single piece of information, that's actually contemplated- But counsel, we're not talking about obviousness here. We're talking about eligibility. A claim to a chemical compound doesn't have to recite its advantages or utility in the claim. And here, when we're talking about eligibility, it's a question of steps and components. Correct, Your Honor. And the reason that I raised the issue of the fact that you could perform this claim and achieve nothing like the benefits that they're counting is if you look through the claim and you send only a small piece of information, even through PUSH, even through this system, that is acknowledged in claim one as being something that was already happening. And I'm not talking about that for obviousness purposes. I'm talking about the fact that that is therefore not the benefit they were attempting to achieve. In fact, the patent itself tells us that the real goal of the patent was a business reason and a commercial reason. In column three, beginning at line 16, the patent says, one possible goal of combining information with advertising content is to achieve a revenue source for the provider. But that's not the only purpose, is it, counsel? It also talks about other purposes. The only other purposes that it ever talks about in the specification of the 351 and 929 patent are helping a user get the right information at a triggering time so that it can potentially reduce cost because the advertising is being sent. Nowhere is anything about improving the computer mentioned in any way. This is not a technological solution to a technological problem. It's a business problem, getting the right information to the right person so that you can reduce cost potentially, just like watching ads. Of course, there's always a business purpose behind software improvement. So the question is, just because it was a business purpose doesn't necessarily mean it's improving, it isn't improving how the proxy content server works. So again, here, Your Honor, we have admissions that the proxy content server is not an improvement in hardware. In fact, we know that this was standard hardware and that the software that we know that not only from the argument of counsel down below when he admitted during the oral argument that the changes to the software were just implementation details, but we know that from the specification itself that talks about constantly about the fact that the way the proxy content server is implemented can be done in several ways. One quote is from the specification of column three, the combining of information may be Unfortunately, the remainder of the specification, the entire intrinsic record is silent as to what those implementation details are, which brings us directly into the two-way media case, where you also had information getting from a source, hopefully to the right person, in a more efficient, they said, in that case way, but there was no description of how that was to happen. What about the bandwidth benefits that are described in the provisional? So, the first answer, Your Honor, is that the provisional is that was dropped from the provisional when it came into this specification, but even if that language were maintained in the specification, the provisional does not say anything other than if you are sending lots of data not using push, you may have bandwidth difficulties, but the claim does not require massive amounts of data being used. Instead, the claim is silent to the volume of data. Therefore, you may not even have a bandwidth issue that needs to be solved. At step one, wouldn't any incremental benefit to the technology be sufficient to render it eligible at step one? I don't believe so, Your Honor, because it's not solving a computer-only problem, and then the last thing I would say is that, for example, BSG tells us that you have to the abstraction out. If simply performing the abstraction results in something beneficial, that's not enough. For example, any amount of filtering for putting the information to the right person is going to achieve bandwidth benefits and potentially battery benefits, but that's simply by practicing the abstraction, which does not take it out of abstraction, nor does it add anything inventive. Is adding the proxy server as a gateway, as a patent says on page 310 on line 60, using the patent as a gateway between the computer network and the wireless network, was that conventional at the time of the patent? Yes, absolutely, Your Honor, and we know that because the inventors actually admitted that being able to use a server to store information was well-known. Their own expert talked about the fact that using a proxy as a gateway between information was well-known. That's an appendix. Not between information. There's a gateway between a computer network and a wireless network. That's exactly where proxies sit. It's between any two pieces, and so the notion that a proxy sits between any information source and a place that receives the information was, in fact, well-known. That's, again, at appendix 11991 through 11993, and also available in... Okay. Does your argument still hold in the case of a mobile device, and the purpose of the proxy server is to push information from the Internet to the mobile device? Absolutely, Your Honor. Nothing changes with the fact that it's a mobile device, and we look to the TLI case for that as well. The mobile device is just the information recipient, and it was well-known that mobile devices could receive push technology, and that is also in the column 1, lines 39 through 46. Okay. Thank you. Thank you, Your Honor. I see my time is up. Thank you, Ms. Keith. We'll hear from Mr. Tchaikovsky. Thank you, Your Honors. Mark Tchaikovsky for Appellate Snap, Inc., for the 084 and T27 patents. You have heard BlackBerry's counsel actually mention during his opening comments that this is an eligible information-gathering and display patent similar to Core Wireless. What you have heard is how BlackBerry's desired characterization is tethered in any way to the claims in terms of having a new display, especially with respect to the 084 patent, which doesn't mention a display or any user interface of any sort. And even BlackBerry agrees it's directed to a server that identifies and transmits action spot information. That's in the blue brief at page 55. And they admit it does not require a display. Any appendix citations to the allegedly disputed material facts presented to the district court that BlackBerry now contends the district court error by not considering or resolving against BlackBerry are not supported or not shown. There is no in light of mostly BlackBerry's propounding those positions and concurrent summary judgment motion for infringement advanced broad constructions and relied on expert testimony that sought for infringement purposes to stretch the claims to cover the circumference of the earth with no precision, limits in time, or any particular way of displaying the collective information. But did the court tend to overgeneralize the claims? I mean, the court didn't consider the proxy content server, the predefined information categories, the feedback signal or triggering events. Isn't that kind of exactly what we always warn against? Oh, okay. Your Honor, I was focusing on the action spot patents. But going back to the ad server patents themselves, no, I would say consistent with, you know, the court in terms of charge point and frankly IV versus capital one, the court took an abstraction that is, you know, collecting information or EPG for that matter and others. And then there are additional elements, claims that are simply as their own expert, Dr. Almoroff suggested in the conventional generic and well-known. I mean, I think Dr. Almoroff during his deposition and in his expert declaration, again, due to infringement concerns, admitted that these are all traditional, well-known and generic concepts. So I don't think any of them rise to the level of what we see in tech sec computer improvements in the technology or something that changes the way in which the to the action spot patents. It seems like you're making the same argument that Ms. Keefe made, which is if you don't have a lot of advance, then we should assume there's no advance. In other words, doesn't display of even one action spot on a graphical user interface improve on the prior art? Well, again, Your Honor, we focus on, for example, the 084, which I know BlackBerry would like to not focus on. There's no display in there. That's how we know. We look at those claims and we see, and as BlackBerry admitted, BlackBerry states again on page 55 that it's simply organizing and changing the action plan. What about the 327? And then the 327, much like in Erickson or TLI, is simply placing what we see in the 085 and Claim 1 into a traditional technological environment that is a mobile communication network. We have a generic processor, a generic display, a generic user interface. We have no novel display. They'd like to mention that there's toggling is somehow, you know, we're getting this. If toggling were patent eligible in and of itself, then EPG with its multiple display inputs would have been a patentable invention. Then IV versus Capital One, which had multiple inputs and displays of information, would be patentable. Interval licensing... What about the ordered combination of the claim elements there? I mean, the argument that your friend on the other side is making is that it is improving technology because it allows the display of information on one user interface when prior art systems required multiple applications. Again, as Judge Wu cited on A105, there was no evidence of the ordered combination, which just has generic specs of receiving, transmitting, and displaying information, and that's all it requires, using generic components, that it changes the character of what the claims are directed to. The claims are directed to collecting and mapping activity of interest or collecting... And we just heard it from counsel in his opening remarks, information gathering and display. That's what the claims are directed to. And then when we just add in the generic components, this court's replete with case law that adding those generic components don't take the ordered combination and make it patentable. Again, TLI, interval licensing is excellent with its, you know, attention manager and its multiple displays being combined together. This is not core wireless, right? In core wireless, we had a summary window in the claims that actually added within it the ability to access applications from that summary window and actually the ability to then launch those applications from that new summary window in and of itself. Here we simply have display action spots, which again, longstanding practices, crime maps that we've seen, earthquake maps that we've seen. As the court was told during the Rule 12 context, absolutely correct. And then the court waited to have the developed record of summary judgment with claim construction, the plaintiff's infringement contentions, BlackBerry's propounded broad claims for action spot, determining one action spot. It's that breadth that is put into this that you rely that the claims are directed to the broad notion of detecting action spots, which we've been doing from time immemorial, like I said, crime maps, earthquake maps at Caltech, which you have been tremors, et cetera, which gives you the activity level on those earthquake maps. And now we've just put it like TLI for interval licensing in a generic mobile environment. There's nothing special to that mobile environment. There's nothing special to that display. This is not what we have in core wireless. It's more like trading technologies, EPG or otherwise. Counselor, are you arguing quantity? Are you arguing that there is no technological advance or improvement at all, or that there's some, but not enough similar to what we've heard before? I don't believe there's a technological advance in either of the two action spot patents at all. I believe the action spot patents in and of themselves are directed to the abstract idea of locating and mapping activity of interest. And in fact, the inventors and those in the record admitted that I was just looking at how to organize information in light of what was happening on social networks. There was no how, there was no way, there was no specificity. This wasn't about that. This was just about identifying action spots. And they thought about it as SAP versus Invespik says, even if you believe your honor, we may assume that techniques claim are groundbreaking, but that doesn't make them eligible. It's not enough for them to pass 102 and 103 muster. Thank you, counsel. We have your argument. Mr. Weisburst, we'll give you your four minutes rebuttal time. Thank you, Judge Lurie. I'd like to start with the business reason issue that was raised by Ms. Keith. So the issue there is that advertising helps bring down the cost of the wireless service. So what we're talking about when we're sending advertising and content is yet more information than you would have had previously. And that gives rise to an even greater use of bandwidth, which is the reason why the provisional and other evidence, including the inventor and expert testimony, talks about the need to reduce bandwidth by using the proxy content server. And this is important that the proxy, I said this in the opening, but I want to underscore it is the proxy content server is not like the prior art proxy servers because it is much more autonomous in what it does. And I think this is prime dispute of fact territory because we heard. Counsel, I have a simple question. I think that will put a lot of clarity into your arguments, at least for me anyway. Are you arguing that the pens are eligible as step one or step two? We're well, we're arguing both, your honor. We certainly. But if you argue that they're eligible as step two, then you're receding that they're directed to a abstract idea that the claims are. We well, we know we strongly are arguing on step one based on and Cora, among other cases. We alternatively have presented an argument under step two. And part of the reason for that is that I'm Cora and Bascom, which I would submit are two key cases. Bascom sort of waffles a little bit. I don't mean to offend the court, but waffles a little bit between step one and step two and goes to step two. And Cora actually relies on Bascom as precedent in the context of step one. So there isn't always a stark distinction, at least in those two cases between the two steps. So we are arguing under both steps. So again, the bandwidth innovation is important. Proxy content server is more autonomous. That's 11995 and 18395. Briefly on the two-way case, which was mentioned that there was much less information in those claims on what the innovation was. And in fact, this court specifically pointed out there was nothing on the feedback signals that were used here. By contrast, the feedback signals clearly describing the claims location of the device, as well as the triggering event being time. So we have that element of specificity that was absent from two-way. And the claim itself, as Judge O'Malley pointed out, not need to recite the benefits. It does certainly need to refer to the features that accomplish those benefits, but here it does so. It talks about a system for push at the preamble of claim one. The preamble is something that can be considered. And it lays out exactly what the much specificity as was present in ANCORA and BASCOM. Turning to the other set of patents- Is the implementation of the push technology that results in a reduction in toggling by the mobile device user, right? Yes. On the second set of patents, that is precisely the key invention is that the prior art, you were toggling back and forth between say a Google search and the map. And you had to keep them both in mind when you're this innovation is that it brings it all together. Inventor Bouchard, who was the second inventor, was cited by my adversary. He was focusing on the information gathering aspect, but the other testimony in the record, which gives rise to the fact dispute among others, 19664 and 19680 is talking about the combination of these two separate applications. Why wouldn't the absence or the non-requirement of so much toggling, why would that not be an improvement in computer functionality? We think it would be an improvement in computer functionality, just as it was in core wireless, DDR, and data engine is when the user has to do less navigating back and forth, that is improved by those cases as an improvement in the efficiency of the computer. It's also a problem unique to the internet, which goes back to the patent intelligence case that I started with. So for all of those reasons, we think that both of these patents should be viewed as non-abstract at the summary judgment stage at step one, and alternatively to have an inventive concept at step two. If the court has no further questions, I'll rest on my briefs. Thank you, counsel. We will try not to waffle this time.